UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
MARTIN KLADNY,

      Petitioner,

                 **MEMORANDUM AND ORDER**
    -against-           25-CV-5754 (OEM)

ALEXANDRA JAZMIN RUIZ DEZA,

      Respondent.
-------------------------------------------------------------------x

ORELIA E. MERCHANT, United States District Judge:

Petitioner Martin Kladny ("Petitioner"), a citizen of Argentina, petitions this Court for the return of his child, M.K.R. (the "Child"), to Argentina pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 *et seq.* ("ICARA"). Verified Petition for Return of the Child, Dkt. 1 (the "Petition" or "Pet."). Petitioner asserts that the Child has been wrongfully retained in the United States by her mother, Respondent Alexandra Jazmin Ruiz Deza ("Respondent"), a citizen of Peru who currently resides in New York.

On October 14, 2025, Petitioner commenced this action,[1] and on December 2, 2025, Petitioner filed a motion for emergency relief. Dkt. 7. On December 3, 2025, the Court issued an Order to Show Cause and Temporary Restraining Order prohibiting Respondent from removing the Child from the Eastern District of New York; requiring Respondent to deposit the Child's passports and travel documents with the Court; and directing Respondent to appear at a hearing

---

[1] This action was initially assigned to a magistrate judge. On December 3, 2025, this action was reassigned to the undersigned.

1

and show cause why the Court should not grant the relief requested in the Petition on December 10, 2025.  Dkt. 8.

Due to service issues, the Court adjourned the deadlines set in the show cause order. Respondent deposited the Child's passport, and the Court set a schedule for answering and reply papers at a conference on December 12, 2025.  *See* Notice of Receipt of Passport, Dkt 14; Minute Entry, dated Dec. 12, 2025.  Respondent answered the Petition on December 17, 2025, and Petitioner filed a reply on December 18, 2025.  *See* Verified Answer to Verified Petition for Return of the Child, Dkt. 18 ("Ans."); Verified Reply for Return of the Child, Dkt. 24.

The Court scheduled an evidentiary hearing on the Petition for January 5, 2026, *see* Minute Entry, dated Dec. 19, 2025, and with the consent of the parties, the Court adjourned the evidentiary hearing to January 12, 2026.  *See* Minute Entry, dated Dec. 30, 2025.  Before the evidentiary hearing, the parties submitted Proposed Findings of Fact and Conclusions of Law.  *See* Respondent's Pre-Trial Proposed Findings of Fact and Conclusions of Law, Dkt. 53; Petitioner's Proposed Findings of Fact and Conclusions of Law, Dkt. 54.

Following a 7-day evidentiary hearing on January 12-14 and 20-23, 2026 (the "Hearing"), *see* Transcript of Civil Cause for Evidentiary Hearing (the "Transcript" or "Tr."),[2] the parties filed written summations.  *See* Petitioner's Summation, Dkt. 58 ("Pet'r Summ."); Respondent's Post-Trial Written Summation, Dkt. 59 ("Resp't Summ.").

This Memorandum and Order sets forth the Court's findings of fact and conclusions of law. After careful consideration of the parties' submissions, the evidence presented at the Hearing, and the applicable law, the Court finds that: (1) the Child is a habitual resident of Argentina and has

---

[2] The Court refers to the parties' exhibits admitted into evidence at the Hearing as "Pet'r Ex." and "Resp't Ex.," respectively.  The Court additionally notes that the Transcript pagination stops at page 322 at the end of the hearing day on January 14, 2026, and begins at page 383 at the beginning of the next hearing day on January 20, 2026.  There are no pages between 322 and 383.

been retained in the United States; (2) Respondent's retention of the Child in the United States was in breach of Petitioner's custody rights; and (3) Petitioner was exercising his rights at the time of the retention.  Additionally, the Court finds that Respondent has failed to show by clear and convincing evidence the affirmative defenses of grave risk and violation of fundamental freedoms and human rights.  Further, the Court finds that Respondent has failed to show by a preponderance of the evidence that the Child possesses a sufficient degree of maturity for the Court to consider her views on return.  Accordingly, the Petition for the return of the Child to Argentina is granted.

## FINDINGS OF FACT[3]

### A.  2016-2022: The Parties' Relationship

Petitioner is a citizen of Argentina, and Respondent is a citizen of Peru.  Pet. ¶¶ 12-13.

In September 2016, Petitioner and Respondent met at a party.  Tr. at 483:1-4.  At the time, both were living in Buenos Aires, Argentina with their families.  *Id.* at 38:16-18, 46:19-21, 483:17-21.  The parties entered into a romantic relationship in December 2016.  *Id.* at 483:8-11.

According to Respondent, several months into their relationship, Petitioner began to exhibit controlling and aggressive behavior, *id.* at 483:22-484:5, which she alleges escalated to physical abuse in May 2017.[4]

In December 2017, Respondent became pregnant with the Child.  *Id.* at 491:6-8.  Shortly thereafter, the parties moved in with members of Petitioner's family, and then to their own

---

[3] Unless otherwise indicated, the parties have established the following facts by a preponderance of the evidence.  *See* 22 U.S.C. § 9003(e)(1)(A) (requiring the elements of a petitioner's prima facie case be proven by a preponderance of the evidence).

[4] Respondent testified that Petitioner physically abused her for the first time in May 2017, when he punched her in the face after going through her phone.  *See* Tr. at 486:6-487:16; Resp't Ex. VVV (picture of Petitioner and Respondent the day after the incident).

3

apartment from July to September 2018. *Id.* at 493:15-25, 499:3-20. Respondent alleges that during this time, Petitioner's abuse continued.[5]

The Child was born on September 4, 2018, in Buenos Aires. Pet'r Ex. 3 (the Child's birth certificate). Respondent, along with the Child, moved back in with her parents following the Child's birth. Tr. at 500:20-24. Petitioner later moved in with them. *Id*. at 524:1-10. The parties, the Child, and Respondent's parents continued living together in Argentina during the first year of the Child's life. *Id.* at 555:5-7. During this time, Respondent alleges that Petitioner's violence continued and at one point resulted in injury to the Child.[6]

In August 2019, an economic opportunity was presented to Respondent's father, and the family decided to relocate to Trujillo, Peru. *Id.* at 555:10-17. Petitioner and Respondent married on August 1, 2019, and the family relocated to Peru one week later. *Id*. at 59:11-15. In Peru, the

---

[5] Respondent testified that on September 3, 2018, Petitioner pushed her, causing her to fall to floor, and while she was on the floor, he kicked her twice in the stomach, causing her to be hospitalized. Tr. at 514:4-16. Respondent testified that this incident occurred the day before the birth of the Child. *See id.* There was no testimony regarding the impact of the alleged incident on the birth of the Child, nor did Respondent produce any documentation, medical or otherwise, related to the incident. *See id.* at 522:2-3 ("Q: After those few hours [at the hospital], did you ultimately go home? A: Yes"). Moreover, Respondent has provided inconsistent accounts of the incident. *Compare* Pet'r Ex. 97 at 16 (Respondent's interrogatory response indicating that her parents drove her to the hospital)*, with* Tr. at 514:17-515:4 (Respondent testifying that Petitioner drove her to the hospital and threatened her while doing so). Petitioner denies getting into a physical altercation with Respondent during her pregnancy with the Child. Tr. at 258:10-14.

[6] At the Hearing, Respondent described an incident in October 2018 when Petitioner took 1-month-old Child from her arms during an argument and "[w]hen . . . he tried to put her in the crib, her head got hit with the side of the crib." Tr. at 525:5-15. Respondent alleges that the Child was then taken to the hospital to undergo medical examinations. *Id.* at 526:20-527:1.

Respondent additionally offered several photos documenting her own injuries after Petitioner had allegedly struck her in the face in May 2019. *See* Resp't Ex. E; Resp't Ex. F; Resp't Ex. G; Resp't Ex. H; Resp't Ex. AAAA. However, several inconsistencies cast doubt on Respondent's assertion that all the pictures were taken the same day. Tr. at 629:23-631:25 (cross-examining Respondent on inconsistencies related to her nails, piercings, and facial bruising).

In July 2019, Respondent alleges that she was battered by Petitioner while he was driving her and 10-month-old Child to the pediatrician, forcing her to jump out of the car. *Id.* at 538:1-539:2. Although the police came to the scene, Respondent did not make a statement as she was afraid of Petitioner. *Id.* at 542:15-24. Respondent testified that she was taken to the hospital by ambulance, *id.* at 543:16-18, but produced no medical records documenting the incident.

4

parties and the Child continued to live with Respondent's parents. *Id.* at 64:3-6. Respondent alleges that Petitioner continued to physically abuse her while in Peru.[7]

In November 2019, Respondent traveled to New York to visit a friend but was unable to return as planned due to Covid-related travel restrictions. *Id*. at 559:13-16; Ans. ¶ 74. Petitioner, the Child, and Respondent's parents remained in Peru together until December 2019.

In December 2019, Petitioner returned to Argentina to continue working as a roof tiler, the job he previously held. Tr. at 74:5-7, 559:17-23. Petitioner left the Child in Peru under the care of her maternal grandparents. *Id*. at 559:17-23.

Petitioner and Respondent reunited with the Child in Peru in December 2020. *Id*. at 210:11-211:4. Petitioner returned to Argentina in January 2021, leaving Respondent and the Child in Peru. *Id.* at 211:5-6. One month later, Respondent joined Petitioner in Argentina, leaving the Child with her maternal grandparents in Peru. *Id.* at 132:18-133:24. The parties continued their romantic relationship until July 2021. *Id*. at 560:2-10. The parties' romantic relationship ended in July 2021.[8]

---

[7] Respondent testified that in September 2019, the parties argued about Petitioner wanting to return to Argentina, and that when Respondent indicated that she and the Child would not return with him, Petitioner started choking her and burning the tips of her hair with a lighter. Tr. at 556:24-557:14. Respondent's mother testified that she did not witness this alleged incident in progress, but rather, she observed the aftermath with the 11-month-old Child in her arms, who was asleep and awakened by the sound of Respondent's mother banging on the parties' locked bedroom door. *Id*. at 682:10-15.

[8] According to Respondent, the relationship ended on account Petitioner's violent behavior. Tr. at 566:8-11. Respondent recounted two instances of physical abuse in 2021: a May 2021 incident where Petitioner threw a fire extinguisher at her as she tried to get out of the car during an argument, and a July 2021 incident when he started strangling her. *Id*. at 561:9-16, 565:20-566:7. As alleged by Respondent, these incidents were the result of Petitioner's anger at Respondent for getting the Child a United States visa and for Respondent's desire to start a life in the United States. *Id*. According to Petitioner, the parties' relationship ended on account of Respondent moving to the United States. *Id*. at 144:1-7. Both parties agree, however, that the relationship was "toxic." *Id.* at 55:12-56:6, 502:24-25.

In late July 2021, Respondent traveled to Peru to visit the Child and her parents.[9]  *Id*. at 581:11-15.  After visiting the Child in Peru, Respondent traveled from Peru to the United States by way of Mexico.[10]  *Id.* at 581:16-582:3.

In late 2022, the parties filed a joint divorce petition.  *Id*. at 143:19-144:7.

**B.  2023-2025: Life in Argentina and the Custody Agreement**

In May 2023, the Child and her maternal grandparents moved back to Argentina, and the Child continued to live with her maternal grandparents.  *Id*. at 157:17-21.

In July 2023, the parties' divorce was finalized by an Argentine court.  *Id*. at 146:25-147:5. Per the parties' divorce agreement, adopted and approved by an Argentine court, the day-to-day care provision assigned physical custody of the Child to Respondent under the "unilateral physical custody modality," while providing the Petitioner with the "right and duty of fluid visitation with the [C]hild."  Pet'r Ex. 13 at 14, 20 (divorce petition and judicial certification).[11]  Respondent delegated the day-to-day care of the Child to her parents as she remained in the United States.  Tr. at 146:18-20, 157:2-5.  As understood by Petitioner, the custody arrangements under the divorce agreement authorized the Child to live in Argentina but not abroad.  *Id.* at 147:21-148:1.

Petitioner began to spend time with the Child, but conflicts arose with the maternal grandparents limiting his access to her.  *Id*. at 163:1-164:14.

---

[9] This was the last time Respondent saw the Child in person until January 2025.  *See* Tr. at 480:19-22 (Respondent testifying that she has lived in New York since 2021).

[10] Following a period of detention by immigration officials, Respondent was released in Arizona and flew to New York, where she has remained since.  Tr. at 583:5-10.

[11] Petitioner contends that he did not understand the child custody terms of the agreement when he first signed it.  Tr. at 146:14-20.  According to Petitioner, he did not discuss custody with Respondent because the Child was in Peru with her maternal grandparents when the parties initiated the divorce, and at the time, he did not realize custody was coupled with the divorce.  *Id*. at 145:20-146:20.

In February 2024, Petitioner sought to increase his parenting time by filing a petition to modify the custody agreement in Argentine court. *Id*. at 166:20-167:7.

During the custody proceedings, the parties agreed that the Child would spend a few nights a week at Petitioner's house. *Id.* at 167:9-12, 169:4-6. Petitioner set up and decorated a room for the Child, and the Child spent her first night at Petitioner's house in May 2024. *Id.* at 168:25-169:3 436:14-21.

Petitioner played an active role in the Child's life, as he arranged her schooling, medical, and dental care. *Id.* at 171:7-183:12; Pet'r Ex. 37 (school registration fee receipts); Pet'r Ex. 135 (panoramic x-ray of the Child's mouth captured at an appointment Petitioner took her to); Pet'r Ex. 136 (prescription from the Child's otolaryngologist given to Petitioner).

While Petitioner's exercise of custody rights is uncontested, Tr. at 198:8-12, the parties have differing accounts of the Child's time with Petitioner and the quality of their relationship. Petitioner's new partner, who lived with Petitioner at the time, described Petitioner as a loving and involved parent. *See id*. at 436:6-437:6, 442:16-443:9 (discussing Petitioner preparing his home for the Child and the activities they would do together); Pet'r Ex. 33 at 1, 7, 22, 23, 24 (photos of the Child and Petitioner taken by Petitioner's partner). Respondent's mother, on the other hand, alleges that the Child's behavior changed after she began spending time at Petitioner's home. *See* Tr. at 688:13-21 (testifying that the Child would cry, urinate involuntarily, wear long shirts and shorts while showering,[12] and experience nightmares).

---

[12] Respondent's mother indicated that the Child used to wear "underwear panty" when she bathed her, but after spending time at Petitioner's, the Child no longer wanted to shower with her and "wanted to be covered up." Tr. 689:17-22. The Child's alleged abnormal behavior while showering was controverted by Petitioner's partner, who testified that the Child showered privately and without issue at Petitioner's home. *Id.* at 824:3-11.

With the consent of Respondent, Petitioner arranged for the Child to receive psychological support in the form of weekly therapy with a licensed psychologist beginning in March 2024. *Id.* at 849:18-850:5, 873:11-13. As explained by the Child's psychologist, Jesica Cecilia Voci ("Voci"), Petitioner sought treatment for the Child to provide an objective space for the Child to communicate any issues or anxieties she had about the changes in her routine and her transition to life in Argentina. *Id.* at 849:20-850:3. As a part of the Child's treatment, Voci interviewed the core adults of the Child's new family dynamic: Petitioner, Respondent,[13] Petitioner's partner, and the Child's maternal grandparents. *Id.* at 850:12-21.

Voci described the Child's demeanor at their first session as relaxed, happy, self-confident, non-resistant and comfortable. *Id*. at 850:25-851:7. Regarding her demeanor at subsequent sessions, Voci stated: "[I]t was always the same, she was very communicative, she knew how to use the space, she was comfortable[.]" *Id*. at 851:8-16. Voci also said that she saw only positive interactions between the Child and Petitioner. *Id*. at 862:3-10 (describing how Petitioner and the Child would kiss and hug when he dropped her off for therapy and how the Child showed no resistance to going with him when he picked her up). Notably, while the Child's initial reaction to sleeping at Petitioner's house was positive, *id*. at 855:3-7, Voci later observed that the Child. "developed a certain level of resistance to staying with him because the subject kept coming up of her moving to the United States to live with mom and that she was not going to see her father again," *id*. at 862:14-17. Voci also indicated that the Child developed a resistance to staying with Petitioner due to her grandparents "becoming sad and . . . saying that if she wanted to stay and live with her father, then they would have no reason to stay in Argentina, and that she -- they may have

---

[13] As a part of the intake process, Voci elicited information about Petitioner from Respondent: "I asked whether she thought [Petitioner] was a dangerous person and she said not at all. He may be very basic, but she did not say that he was dangerous." Tr. at 878:13-16.

to go back to Peru if she decided to stay and live with [Petitioner]."[14]  *Id*. at 855:9-16.  As put by Voci, the Child

> never expressed any negative comments nor negative feelings about spending time with her father or her father's partner.  It was after having spent time with her father when she went back to her maternal grandparents that she would say that they -- that she started to feel sad because she felt that they would say, if you want it stay with your father, then, you know, we're going to go back to Peru because we'll have no reason to stay here but maybe -- and so you need to learn English to be able to go to New York or to Peru.  I don't know whether [the Child] was mixing some countries or whatnot.  But I think what made her anxious and upset is to, you know, not be able to spend time with both of her families and to be placed in that situation.[15]

*Id*. at 860:24-861:11.

The Child's sessions continued until September 2024, at which point Respondent withdrew her consent for the Childs's treatment.  *Id.* at 871:2-8.  Respondent withdrew her consent the day after Voci submitted a report[16] on the Child to the Argentine family court overseeing the custody proceedings.  *Id*.  Voci noted that if Respondent had not withdrawn her consent, she intended to lessen the frequency of the sessions out of concern they were becoming monotonous and frustrating for the Child.  *Id*. at 880:14-24.  Voci stated that this was not because of a lack of

---

[14] This statement is not considered by the Court for its truth but for the effect on the listener, the Child.

[15] The statements by the Child's maternal grandparents are not considered by the Court for their truth but for their effect on the listener.

[16] The Court reserved decision on Respondent's objection to the admissibility of three reports produced by Voci for the Argentine family court: Petitioner's Exhibit 6, Report by Child's Psychologist Provided to Family Court in Argentina, dated August 12, 2024; Petitioner's Exhibit 7, Report by Child's Psychologist Provided to Family Court in Argentina, dated September 23, 2024; and Petitioner's Exhibit 8, Report by Child's Psychologist Provided to Family Court in Argentina, dated September 26, 2024.  Respondent's hearsay objection, Tr. at 869:6-10, is sustained. Petitioner contended that the reports are "medical records and official records," *id*. at 869:11-2, but they were created for the purpose of litigation and are inadmissible as business records or public records under Federal Rules of Evidence 803(6) and 803(8).  *See United States v. Feliz*, 467 F.3d 227, 237 (2d Cir. 2006) (noting that business records under 803(6) and public records under 803(8) exclude "documents prepared for the ultimate purpose of litigation").  They are likewise inadmissible under Federal Rule of Evidence 803(4), as Voci's statements were not made for the purpose of medical diagnosis or treatment.  Rather, the statements in the reports were made to update the court on the Child's development and her issues navigating the family dynamic.  The reports therefore do not meet the requirements of the medical records exception.  *See Johnson v. Pacheco*, 20-3758-cv, 2022 WL 102072, at *1 (2d Cir. Jan. 11, 2022) ("Rule 803(4) provides a hearsay exception if a statement 'is made for—and is reasonably pertinent to—medical diagnosis or treatment.'" (quoting Fed. R. Evid. 803(4)(A))).

progress with her but rather external obstacles related to the Child's maternal family. *Id*. at 880:25-881:3, 881:16-21.

The conflict between the Child's maternal and paternal families, and her place at the center of it, is further reflected by an incident that took place on September 21, 2024. According to the Child's maternal grandmother, Petitioner was due to bring the Child to her maternal grandparents' home at 10:00 p.m. but showed up an hour late. *Id*. at 690:4-12; Resp't Ex. CCCC (police report, dated Sep. 22, 2024). When Petitioner arrived, the Child's grandmother noticed through the peephole of her front door that Petitioner was angry and the Child was crying. Tr. at 690:13-18. According to Respondent's mother, when she opened the door slightly, Petitioner kicked it open and threatened her. *Id.*; Resp't Ex. CCCC (indicating that Petitioner said "I'm going to ruin your life and your daughter's"). According to Respondent's mother, the Child told her that Petitioner did not let her speak to her mother, Respondent, and tried to force her to stay at his house. Resp't Ex. CCCC.

The parties executed a custody agreement in October 2024, Pet'r Ex. 15 (custody agreement), and it was judicially certified by the Argentine court in December 2024, Pet'r Ex. 16 (judicial certification). Pursuant to the agreement, the Child started staying at Petitioner's house four times a week, from after school on Wednesday through Sunday. Pet'r Ex. 15 at 5. The custody agreement establishes Petitioner's home in Argentina as the Child's main residence. *Id.* at 4 ("[T]he main residence of the minor being with her father, currently at Dean Funes 375, Boulogne."). Additionally, the custody agreement allows for the Child to visit Respondent in the United States ten days during school winter break vacation and 45 days during summer break periods, with Respondent responsible for related travel expenses and Unaccompanied Minor

10

Service with the airline and/or other suitable accompaniment for the Child *Id.* at 5. The custody agreement remains in effect to this date.

### C. January 2025: Travel to the United States and Subsequent Legal Proceedings

Shortly after the custody agreement was reached, but before it was judicially certified, Respondent purchased round-trip airline tickets for the Child to travel to New York. Tr. at 187:14-188:2. The tickets reflected that the Child was to depart from Buenos Aires on January 2, 2025, and return on February 18, 2025. Pet'r Ex. 5 (travel itinerary); Tr. at 187:17-19. Petitioner subsequently signed a travel authorization for the Child to visit New York for that period. Pet'r Ex. 4 (travel authorization); Tr. 185:16-22. In the period leading up to her departure, Petitioner's partner described the Child as "clingy" and affectionate with Petitioner. Tr. at 450:19-23; Pet'r Ex. 33 at 24 (picture of Petitioner and the Child taken one week before the Child left for the United States).

On January 2, 2025, the Child, then 6 years old, departed from Argentina to the United States to visit Respondent. *See* Pet'r Ex. 5. According to Respondent, several days after her arrival in New York, the Child allegedly disclosed to her that Petitioner abused her.[17] Tr. at 605:5-606:7.

On February 11, 2025, Respondent filed a Family Offense Petition in Nassau County Family Court seeking an Order of Protection for herself and the Child based on Petitioner's alleged

---

[17] According to Respondent, the Child had previously told her that Petitioner had slapped her in November and December 2024, which Petitioner denied on both occasions. *See* Resp't Ex. BB (messages between Petitioner and Respondent, dated Dec. 8, 2024); Resp't Ex. BBBB (messages between Petitioner and Respondent, dated Nov. 27, 2024). As for the Child's alleged disclosures in January 2025, Respondent asserts that the Child expressed a desire to not return to Argentina because "her father treated her so badly, that he hit her, he spat on her, he slapped her, he locked her in her room, and so did [her] father's partner." Tr. at 605:5-606:7. Although the Court sustained a hearsay objection to these statements, *id.* at 606:8-10, the Court considers these statements for the non-hearsay purpose of effect on the listener. *See* Fed. R. Evid.801(c). While Petitioner denied these allegations, he admitted to two instances of physical discipline: "slightly slap[ping]" the Child after she disrespected her grandmother and giving her "a very light slap or tap on her buttocks" after she dropped Petitioner's 2-year-old niece. *See id.* at 281:3-11, 299:5-19.

physical and psychological abuse.  Ans. ¶ 90.  The Child was appointed an Attorney for the Child ("AFC") to represent her interests in those proceedings.  *Id.* ¶ 91.

On February 13, 2025, Petitioner first learned of Respondent's intention to keep the Child in the United States.  *Id*. at 192:20-22.  Respondent initially advised Petitioner that she was enrolling the Child in an English and theatre institute to occupy her while she worked, but Respondent later disclosed that she had enrolled the Child in a full-time school.[18]  Pet'r Ex. 131 (messages between Petitioner and Respondent, dated Jan. 18, 2025); Pet'r Ex. 132 (messages between Petitioner and Respondent, dated Feb. 28, 2025); Tr. at 193:1-194:8.

On February 17, 2025, Petitioner informed the Child's school in Argentina that she would not be coming back.  Pet'r Ex. 36 (correspondence with the Child's school); Tr. 196:6-8.  Petitioner, however, stayed in communication with the school throughout 2025 and continued paying her registration fee so that the Child would not lose her spot.  Pet'r Ex. 44 (correspondence with the Child's school); Tr. at 194:13-21.  Petitioner also filed a police report and contacted his attorney and the Argentine foreign ministry to initiate Hague Convention proceedings.  Pet'r Ex. 21 (police report, dated Feb. 20, 2025); Pet'r Ex. 19 (letter from the U.S. Department of State to Respondent for the voluntary return of the child, dated Aug. 6, 2025); Tr. at 196:24-197:25.  At no time did Petitioner consent to the Child staying in the United States permanently.  Tr. at 198:19-199:3.

On February 21, 2025, Respondent filed an affirmative asylum application on the Child's behalf, which is currently pending.  Resp't Ex. T (asylum application); Tr. at 603:20-22.

---

[18] While Respondent could not recall the date she first contacted the school, Tr. at 664:24-665:1, she testified that she went to the school on January 20, 2025, and spoke to people in the school's office, *id*. at 666:14-667:1.  Respondent's interrogatory answers confirm that date as well.  *See* Pet'r Ex. 98 at 5.  The Court takes judicial notice of the fact that January 20, 2025, was Martin Luther King Jr. Day, a federal and state holiday.

In August 2025, the Child disclosed that Petitioner touched her inappropriately when he bathed her during the limited months he shared physical custody of her.  Ans. ¶ 91.[19]

In December 2025, Respondent had the Child evaluated by a forensic psychology expert for the purpose of this litigation.  Tr. at 712:25-713:8.  In forming his expert opinion, Dr. Peter Favaro ("Dr. Favaro") spoke to Respondent, the Child's maternal grandparents, and the Child's American therapist.  *Id.* at 715:22-25.  Respondent described Petitioner to Dr. Favaro as "manipulative" and "narcissistic," saying he would "hit her then apologize" and abuse her "physically, emotionally, and sexually on numerous occasions."[20]  *Id.* at 734:10-19.  During her evaluation, the Child disclosed to Dr. Favaro that Petitioner would strike her face and touch her private parts in the shower and while she was in bed, which made her feel "sad and mad."  *Id*. at 748:8-20.  Dr. Favaro observed that the Child "became very dysregulated" and that her speech lapsed into Spanish when she spoke about Petitioner.  *Id*. at 758:18-759:18.

Dr. Favaro ultimately concluded that, assuming all allegations of abuse were true, the Child would face the risk of re-traumatization if she returned to Argentina.  *Id.* at 771:17-25.  In reaching this conclusion, Dr. Favaro did not review records related to the Child's therapy in Argentina, and he was not aware that the Child underwent therapy with a psychologist in Argentina.  *Id.* at 768:19-25.  With regard to the Child's maturity, Dr. Favaro opined that "maturity [is] a hypothetical construct.  There's no specific definition of maturity.  [The Child] was mature enough to know that if she returned to Argentina, she would be frightened, okay.  And [he] took that as a measure of her maturity.  [The Child] understood what she was saying, and she understood the consequences of

---

[19] The Court acknowledges that testimony regarding the Child's August 2025 disclosure to the AFC was improperly elicited at the Hearing as hearsay. Tr. at 607:7-609:18.  Herein, the  Court cites Respondent's Verified Answer for the purpose of establishing a timeline and providing context for the Child's subsequent forensic evaluation, not for the truth of the matter asserted.

[20] At the Hearing, Respondent did not testify that Petitioner had ever abused her sexually.

13

what might happen if she returned." *Id.* at 769:14-24.  Nonetheless, Dr. Favaro stated that he has never found a 7-year-old to be "mature." *Id.* at 796:25-797:1.

## CONCLUSIONS OF LAW

### A.  The Hague Convention

The Hague Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention."  Hague Convention at Preamble.  The Convention does so by establishing procedures "'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quoting Hague Convention art. 1).  The United States has implemented the Hague Convention through ICARA.  *Id.* at 9; *see also* 22 U.S.C. §§ 9001 *et seq.* United States district courts have original jurisdiction over actions arising under the Hague Convention.  *See* 22 U.S.C. § 9003(a).

The remedy under the Hague Convention is the return of the child to their country of habitual residence. *Abbott*, 560 U.S. at 9.  When a child younger than sixteen "has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Id.* (citing Hague Convention arts. 4, 12).  A removal is wrongful where

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3.

To establish a prima facie case of wrongful removal or retention under the Hague Convention, a petitioner must establish by a preponderance of the evidence that

14

(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005); *see also* 22 U.S.C. § 9003(e)(1).

If a petitioner establishes a prima facie case of wrongful removal or retention, the child must be returned to the place of habitual residence unless one of the affirmative defenses set forth in the Hague Convention applies. *See Mota v. Castillo*, 692 F.3d 108, 113 (2d Cir. 2012). A respondent opposing the return of the child has the burden of establishing, by clear and convincing evidence, that one of the exceptions set forth in Article 13(b) or Article 20 of the Hague Convention applies or, by a preponderance of the evidence, that any other exception set forth in Article 12 or Article 13 of the Hague Convention applies. 22 U.S.C. § 9003(e)(2); *see also Blondin v. DuBois (Blondin II)*, 189 F.3d 240, 245-46 (2d Cir. 1999). Importantly, a court's consideration of a Hague Convention petition may not consider the merits of any underlying custody disputes, *see* Hague Convention art. 16; "[r]ather, ***the Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings***," *Mota*, 692 F.3d at 112 (emphasis added).

## B. Petitioner's Prima Facie Case

The Court first considers whether Petitioner has established a prima facie case of wrongful retention by a preponderance of the evidence.[21]

---

[21] Because the Petition focuses on wrongful retention, rather than wrongful removal, *see* Pet. ¶¶ 30-32, the Court assesses the merits based on wrongful retention. "'[W]rongful retention' occurs when one parent, having taken the child to a different Contracting State with permission of the other parent, fails to return the child to the first Contracting State when required." *Marks ex rel. S.M. v. Hochhauser*, 876 F.3d 416, 421 (2d Cir. 2017).

### 1.  Habitual Residence

Petitioner must first demonstrate that Argentina was the Child's habitual residence.  *See Gitter*, 396 F.3d at 130-31.  Habitual residence is undefined by the Hague Convention, but the Second Circuit recommends a two-step analysis:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations.  Normally the shared intent of the parents should control the habitual residence of the child.  Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Id.* at 134.  Put a different way, courts consider the totality of the circumstances when determining habitual residence and may consider factors such as "where a child has lived, the length of time there, acclimatization, and the 'purposes and intentions of the parents.'"  *See Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020) (citing *Monasky v. Taglieri*, 589 U.S. 68, 79 (2020)).

### a.  Shared Intent

In line with the Second Circuit's recommendation to look to "declarations" of the parties' shared intent, *Gitter*¸ 396 F.3d at 134, district courts in this Circuit have acknowledged that consensual agreements between the parties play a significant role in determining habitual residence of a child.  *See, e.g., Pignoloni v. Gallagher*, 12-CV-3305, 2012 WL 5904440, at *48 (E.D.N.Y. Nov. 25, 2012) (relying on the parties' consensual separation agreement as a manifestation of shared intent to change the children's habitual residence to the United States); *Guzzo v. Cristofano*, 11 Civ. 7394, 2011 WL 6934108, at *5 (S.D.N.Y. Dec. 30, 2011) ("[T]he Court finds that the Separation Agreement, pursuant to which the parties agreed that Respondent would have custody of the child, live with the child in New York, and send the child to school in New York, constitutes

16

the last shared intent of the parties."). The relevant period of habitual residence is the span of time immediately before the date of the alleged wrongful retention. *Monasky*, 589 U.S. at 77.

Here, in May 2023, the Child moved from Peru back to Argentina, and the parties executed a custody agreement on October 16, 2024, which established that the Child's "main residence" is Petitioner's home in Argentina. Pet'r Ex. 15. Per the judicially certified agreement, Respondent has limited custody rights during school vacation periods in summer and winter. *Id.* There is no evidence suggesting that the agreement was entered into unknowingly or involuntarily. Accordingly, the last shared intent of the parties was for the Child's habitual residence to be Argentina.

### b. Acclimatization

In rare circumstances, a child may acclimatize to new surroundings such that their habitual residence has shifted. Requiring return to the original country would therefore be tantamount to "taking the child 'out of the family and social environment in which its life has developed.'" *Gitter*, 396 F.3d at 134 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001)); *see also Hofmann v. Sender*, 716 F.3d 282, 293-94 (2d Cir. 2013). The Second Circuit has, however, cautioned that "courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Gitter*, 396 F.3d at 134 (quoting *Mozes*, 239 F.3d at 1079). "A finding that this standard is satisfied is therefore only appropriate 'in "relatively rare circumstances" in which a child's degree of acclimatization is "so complete that serious harm . . . can be expected to result from compelling his or her return to the family's intended residence."'" *Hofmann,* 716 F.3d at 294 (quoting *Mota*, 692 F.3d at 116). "When applying this framework, the age of the child and the time spent in the respective countries can affect how much weight a court should place on parental intent." *Guzzo*, 719 F.3d at 108.

17

Respondent disputes that the Child's habitual residence is Argentina.  Her main contention is not that the Child's habitual residence has shifted to New York.[22]  Rather, Respondent contrasts the quality of stability of the Child's life in Peru with her life in Argentina to argue that the Child's habitual residence was not Argentina at the time of the retention.  *See* Resp't Summ. ¶¶ 6-11.

Respondent's arguments on this point are unavailing.  The habitual residence analysis is based on the totality of the circumstances, *Monasky*, 589 U.S. at 68, and this is not a rare situation where the Child's acclimatization trumps shared intent, *see Gitter*, 396 F.3d at 134.  The Child moved to Peru at 11 months old and returned to Argentina at 4 years old.  She was 6 years old at the time of the alleged wrongful retention.  Although the Child spent much of her young life in Peru, acclimatization is not as relevant where the child is so young.  *See Gitter*, 396 F.3d at 134; *Monasky*, 589 U.S. at 78 ("For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant.").

The quality of stability of the Child's life in Argentina also does not trump the parties' shared intent.  To the extent this argument relies on Petitioner's alleged abuse of the Child, the Court finds that the veracity of these allegations is questionable.  *See infra* Section C.1.b.  While the record does establish that the Child was at the center of a heated and contentious family dynamic, *see* Resp't Ex. CCCC; Tr. at 860:24-861:11 (discussing the Child's struggles

---

[22] Respondent nonetheless argues that even if the Child's habitual residence shifted to Argentina, "this Court could reasonably find that by the time the Petition was filed the Child's habitual residence had shifted to the United States where she was attending school and had a home." Resp' Summ. ¶ 12. This argument is unavailing. The relevant time for acclimatization is the period before the alleged wrongful retention. *See Morales v. Restrepo*, 24-cv-07951 (NCM) (TAM), 2025 WL 939294, at *8 (E.D.N.Y. Mar. 28, 2025) (considering only the child's four-month tenure in the United States prior to the date of alleged wrongful retention); *Ordonez v. Tacuri*, 09-CV-1571 (FB), 2009 WL 2928903, at *6 n.8 (E.D.N.Y. Sept. 10, 2009) ("The Court is mindful that it would be inappropriate to consider the period of time *after* the alleged wrongful removal in the acclimatization analysis, as this could 'reward the [allegedly] abducting parent for the time during which the child was [allegedly] wrongfully retained or removed."); *Tatari v. Durust*, 24-CV-6930 (CBA) (SJB), 2024 WL 4956307, at *5 (E.D.N.Y. Dec. 3, 2024) (holding that, despite evidence indicating the child may have become acclimatized to the United States in the three months since a move from Turkey, the child lived in Turkey until he was brought to the United States, so Turkey was his habitual residence).  The Child was only in New York for less than two months of the period before the alleged wrongful retention. *See* Pet'r Ex. 4.

transitioning to shared custody), the Child was born in Argentina and has an Argentine ID, *see* Pet'r Ex. 3; Pet'r Ex. 43 (Argentine ID).  The Child was also enrolled in school in Argentina, both sets of grandparents live in Argentina, and many other family members live there as well.  Tr. at 199:21-24; Pet'r Ex. 33 at 3-6, 10, 36, 41; Pet'r Ex. 37.  The Child also had a dentist and an otolaryngologist in Argentina and was enrolled in therapy to help navigate the new family dynamic.  Pet'r Ex. 135; Ex. 136; Tr. at 850:4-7 (discussing the Child's weekly therapy from March to September 2024).

Accordingly, Petitioner has established by a preponderance of the evidence that the Child's habitual residence was Argentina.

### 2. Breach of Custody Rights Exercised at Time of Retention

The Court next considers whether Petitioner has established the second and third elements of a prima facie case under the Hague Convention.  Petitioner must demonstrate that the Child's retention in the United States in February 2025 was in breach of Petitioner's custody rights under Argentine law, and that Petitioner was exercising those rights at the time of the retention.  *See* Hague Convention, art. 3; *Gitter*, 396 F.3d at 130-31.  Under Article of 3 of the Hague Convention, custody rights may arise by "reason of an agreement having legal effect under the law of that State."

As discussed above, the parties executed a custody agreement in October 2024 that was judicially certified by an Argentine court.  Pet'r Ex. 15; Pet'r Ex. 16.  The agreement provided Respondent with limited vacation rights that needed to be approved by Petitioner.  *See* Pet'r Ex. 15.  In accordance with the agreement, Petitioner signed a judicially certified travel authorization for the Child to visit Respondent in the United States from January 2, 2025, to February 18, 2025.  Pet'r Ex. 4.  The Child's round-trip airline tickets also reflect authorization for those dates.  Pet'r

19

Ex. 5.  The record establishes that Petitioner did not consent to the Child's retention beyond February 18, 2025.  Pet'r Ex. 21; Tr. at 198:19-199:3.

Furthermore, Respondent does not contest that Petitioner was exercising custody rights at the time of the retention.  Pet'r Ex. 15 ("[T]he main residence of the minor being with her father, currently at Dean Funes 375, Boulogne."); Tr. at 171:2-4 (Petitioner testifying that "[the Child's] main residence when the agreement was finalized was to be [his] home where [he is] renting currently"); Tr. at 171:1-183:12 (Petitioner testifying regarding his active role in the Child's life); Tr. at 198:8-12 (counsel stating that Respondent is not contesting the exercise of custody of rights).

Based on the credible facts in the record, the Court finds that Petitioner has established a prima facie case of wrongful retention under the Hague Convention and ICARA.

### C.  Affirmative Defenses

Having found that Petitioner has established a prima facie case of wrongful retention, the Court now considers whether Respondent has met her burden of proof as to an affirmative defense. *See*. 22 U.S.C. §§ 9001(a)(4), 9003(e)(2); *Souratgar v. Lee*, 720 F.3d 96, 101-02 (2d Cir. 2013). Respondent asserts three affirmative defenses: the "grave risk defense," "mature age defense," and the "violation of human rights and fundamental freedoms defense."

#### 1.  Grave Risk Defense

The "grave risk" affirmative defense precludes return if there is clear and convincing evidence that return would place a child "at a 'grave risk' of harm or otherwise in 'an intolerable situation.'"  *See Monasky*, 589 U.S. at 72 (quoting Hague Convention art. 13(b)); 22 U.S.C. § 9003(e)(2)(A).  Hague Convention Article 13(b) contemplates grave risk in two situations: "(1) where returning the child means sending him to 'a zone of war, famine, or disease'; or (2) 'in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country

of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.'" *Blondin v. Dubois (Blondin IV)*, 238 F.3d 153, 162 (2d Cir. 2001) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996)); *see also Friedrich,* 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence."). "Clear and convincing evidence" is evidence that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *See Blair v. Inside Ed. Prods.*, 7 F. Supp. 3d 348, 358 (S.D.N.Y. 2014) (quoting *In re Martin*, 538 N.W.2d 399, 410 (Mich. 1995))).

### a.  Spousal Abuse Allegations

Spousal abuse "is only relevant under Article 13(b) if it seriously endangers the child. The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Souratgar*, 720 F.3d at 103-04. This exception has been found "where the petitioner showed a 'sustained pattern of physical abuse and/or a propensity for violent abuse' that presented an intolerably grave risk to the child." *Id.* at 104 (quoting *Laguna v. Avila,* 07-CV-5136 (ENV), 2008 WL 1986253, at *8 (E.D.N.Y. May 7, 2008)). "Sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child have not been found to constitute a grave risk." *Id.* (citing *In re Filipczak,* 838 F. Supp. 2d 174, 180 (S.D.N.Y. 2011)). Courts have found the grave risk exception is not met when the petitioner was physically abusive towards the respondent, but there was no

21

clear and convincing evidence that the petitioner posed a grave risk to the child by virtue of efforts to control the respondent parent. *See Grano*, 821 Fed. App'x at 28-29. "A grave risk of harm occurs where the 'petitioning parent has actually abused, threatened to abuse, or inspired fear in the children in question.'" *Id.* at 27 (quoting *Ermini v. Vittori,*758 F.3d 153, 164 (2d Cir. 2014)). To "hold evidence of spousal conflict alone, without a clear and convincing showing of grave risk of harm to the child, to be sufficient to decline repatriation, would unduly broaden the Article 13(b) defense and undermine the central premise of the Convention: that wrongfully removed children be repatriated so that questions over their custody can be decided by courts in the country where they habitually reside." *Souratgar,* 720 F.3d at 105-06.

Respondent places great emphasis on Petitioner's pattern of violence toward her throughout their relationship, *see* Resp't Summ. ¶¶ 17-21, which Petitioner largely denies, *see* Pet'r Summ. at 20-22. However, while spousal abuse may have occurred during the parties' relationship, the evidence presented by Respondent is incomplete and inconsistent, leading the Court to question Respondent's credibility as well as the frequency and extent of the alleged abuse.

First, Respondent has failed to present any contemporaneous communications or medical records related to the alleged incidents, which would be particularly probative of Respondent's hospitalization when Petitioner allegedly kicked her in the stomach while pregnant, *see supra* note 5, and of her trip to the hospital in an ambulance when she allegedly jumped out of Petitioner's moving car, *see supra* note 6.

Second, Respondent relies on pictures of her injuries to prove that the violence occurred when it did. *See* Resp't Ex. VVV; Resp't Ex. AAAA; Resp't Ex. F; Resp't Ex. G; Resp't Ex. H; Resp't Ex. E; Resp't Ex. M; Resp't Ex. XXX; Resp't Ex. ZZZ; Resp't Ex. YYY; Resp't Ex. L. But on cross-examination, it was apparent that these pictures lack dates, context, metadata or any

22

information to prove they were the results of the alleged incidents. Tr. at 632:1-13. They also present inconsistencies. *See, e.g., supra* note 6 (discussing Respondent's inconsistent assertion that the pictures in Respondent's Exhibits AAA and F were taken the same day). Respondent identified certain pictures as relating to a specific incident at the Hearing, but that identification conflicted with her prior filings in Nassau County Family Court. *Compare* Tr. at 632:14-22 (Respondent indicated that the pictures admitted into evidence as Respondent's Exhibit XXX were taken after the July 2019 incident), *with* Pet'r Ex. 17 at 5, 76-78 (in a verified family court filing, Respondent indicates that the same pictures were taken following the September 2019 incident). There are also inconsistencies between her verified statements in Nassau County Family Court and hearing testimony provided by both Respondent and her mother on certain events. *Compare* Pet'r Ex. 17 at 5 (in a verified family court filing, Respondent indicates that the September 2019 strangulation and hair burning incident took place in the Child's bedroom while she was in her crib), *with* Tr. at 681:6-682:15 (Respondent's mother testifying that the September 2019 incident took place in the parties' bedroom, and that she had picked up the awakened Child from another room and was holding her when the bedroom door opened), *and* Tr. at 556:24-557:5 (Respondent testifying that the September 2019 incident took place in the parties' bedroom).

Further, Respondent's testimony regarding Petitioner's violence is contradicted by her own pre-litigation statements. *See supra* note 13 (Respondent's statement to Voci that she did not believe Petitioner was dangerous). Prior contradictory statements by Respondent were also memorialized in a New York police report filed on April 30, 2025. Resp't Ex. B (police report, dated Apr. 30, 2025). Under the penalty of perjury, Respondent stated "NO" when asked whether Petitioner ever tried to strangle or choke her or whether Petitioner ever beat Respondent while pregnant. *Id.* Respondent also checked "NO" when asked whether Petitioner is capable of killing

23

Respondent and the Child.  *Id.*  Respondent again checked "NO" asked whether the suspect is violently and constantly jealous of her.  *Id.*  Most notably, Respondent checked "NO" when asked whether there is reasonable cause to suspect the Child may be the victim of abuse, neglect, maltreatment, or endangerment.  *Id.*

Beyond the veracity of Respondent's accounts of spousal abuse, the alleged abuse still must subject the child to a grave risk of physical or psychological harm in order to except return.  *Souratgar*, 720 F.3d at 103-04.  While a child's exposure to spousal abuse may create the requisite grave risk, *id.* at 104, that is not the case here.  As discussed below, of the incidents alleged by Respondent, few allegedly involved or were in the presence of the Child.

The first alleged incident was Petitioner kicking Respondent in the stomach while she was pregnant with the Child.  *See supra* note 5.  Not only is there no medical documentation of the incident, but Respondent has also recounted the story inconsistently.  *See id*.  The Court therefore does not find Respondent's testimony regarding the incident to be credible.

As to the alleged incidents following the Child's birth.  Respondent testified that when Petitioner was trying to place the Child in a crib, he hit her head against the side of it.  *See supra* note 6.  However, by Respondent's own admission at the Hearing, that incident was incidental and accidental, not intentional.  *See* Tr. at 525:5-15 ("When . . . he tried to put her in the crib, her head got hit with the side of the crib.").

Respondent also testified regarding an incident where she jumped out of Petitioner's car when the 10-month-old Child in the backseat, and an incident where Petitioner burnt the tips of her hair and her mother, with the 11-month-old Child in her arms, was outside the bedroom door but witnessed the aftermath.  *See supra* notes 6, 7.  The truth of these incidents aside, the Child does not remember them, and she affirmed that herself during her therapy with Voci: "In fact,

whenever she would bring up her mom, she would say, I am going to meet my mom because I do not know my mom.  She would ask me, do you now my mom, because I have no memories of her."  Tr. at 863:21-24.  Under these circumstances, Respondent cannot establish by clear and convincing evidence that past alleged spousal abuse would expose the Child to a grave risk of psychological harm upon her return to Argentina, as there are no memories upon which the Child could face re-traumatization.  *See Blondin IV,* 238 F.3d at 160–61 (affirming denial of a petition to repatriate after an expert psychologist opined that returning the boy and girl to France, where they had been abused by their father, would likely trigger recurrence of PTSD, and that no arrangement could mitigate this risk); *Souratgar*, 720 F.3d at 104 (upholding the district court's finding that that the grave risk exception did not apply as "there is nothing in the record beyond speculation that [the child] would suffer unavoidable psychological harm if returned to Singapore").

Accordingly, Respondent has not made a clear and convincing showing of grave risk based on the alleged spousal abuse.

### b.  Child Abuse Allegations

Evidence showing abuse of the Child may, of course, support a finding of grave risk. Courts have found such risk of harm where the "petitioning parent ha[s] actually abused, threatened to abuse, or inspired fear [of abuse] in the children in question." *Ermini*, 758 F.3d at 164–65.  Here, Respondent raises two types of abuse: (1) physical and psychological abuse and (2) sexual abuse.

Beginning with Respondent's allegations of physical and psychological abuse, courts have found a parent emotionally or psychologically abusing a child to be grave risk.  *See, e.g., Davies v. Davies*, 717 F. App'x 43, 47–48 (2d Cir. 2017).  Sporadic and isolated instances of physical discipline and verbal unkindness, however, do not rise to the level of grave risk.  *See Souratgar*,

25

720 F.3d at 104; *see also Sanchez v. Sanchez*, 1:18CV449, 2021 WL 1227133, at *18 (M.D.N.C. Mar. 31, 2021) (hitting a child with a phone cable which resulted in red to purple marks is insufficient to satisfy grave risk standard); *Foster v. Foster*, 654 F. Supp. 2d 348, 361 (W.D. Pa. 2009) (spankings insufficient to constitute grave risk); *McManus v. McManus*, 354 F. Supp. 2d 62, 69-70 (D. Mass. 2005) (holding that "two incidents" of a mother striking two of her four children and a generally chaotic home environment was insufficient to establish a grave risk of harm because it did not show "a sustained pattern of physical abuse").

Here, Respondent has not presented credible firsthand accounts or other reliable forms of contemporaneous evidence of abuse of the Child prior to her January 2025 arrival in the United States for a winter break visit with Respondent, her first visit with her since 2021. Rather, the allegations arise from two alleged incidents in November and December 2024. *See supra* note 17. These incidents were referenced by Respondent in text message threads on November 27, 2024, *see* Resp't Ex. BBBB, and December 8, 2024, *see* Resp't Ex. BB. Not only did Petitioner deny the allegations in real time via text, *see* Resp't Ex. BB; Resp't Ex. BBBB, but the messages are subject to interpretation. Moreover, in observing Petitioner testify, the Court finds credible his accounts of the two instances of discipline that he admitted to, *see supra* note 17, as "sporadic [and] isolated incidents of physical discipline," which do not constitute grave risk. *See Souratgar*, 720 F.3d at 104.

Regarding the allegations disclosed after the Child came to the United States, *see supra* note 17, such allegations are unsupported by any credible or reliable contemporaneous evidence.

While Respondent's mother testified as to changes in the Child's behavior after she began spending more nights at Petitioner's home, *see* Tr. at 688:13-21, she did not mention any physical

26

injuries suffered by the Child after spending time at Petitioner's house, nor were any physical injuries documented.

In terms of the Child's changed behavior and its relation to the grave risk analysis, the Court finds the testimony of the Child's treating psychologist, Voci, particularly reliable. Voci treated the Child long before this litigation arose, had no prior connection to either party, and interviewed every relevant family member in 2024. *Id.* at 850:12-21, 872:20-22. Voci's testimony indicates that the Child struggled within the new family dynamic, and while she reacted positively to spending nights with Petitioner, she felt torn between him and her maternal family. *See id.* at 860:24-861:11. Voci also observed only positive interactions between the Child and Petitioner. *Id.* at 862:3-10. Considering this credible account, the Child's changed behavior can be attributed to the distress of her new family dynamic rather than abuse by Petitioner. The Court acknowledges that Respondent's mother testified regarding the Child's changed behavior from September 2024 through January 2025, the period after Respondent had revoked her consent for the Child's therapy with Voci. *See* Respondent's Summation ¶ 27. But the Court does not find it credible that Petitioner's alleged abuse began in the period immediately following the Child's therapy, despite the fact that Petitioner had already been spending significant time with her. *See* Tr. at 169:2-6 (Petitioner testifying that the Child began staying at his house two nights a week beginning in late May 2024).

Given the lack of reliable, contemporaneous evidence proffered by Respondent and the credible testimony offered by Voci, the Court finds Respondent has failed to meet her burden of establishing grave risk on the grounds of physical or psychological abuse of the Child.

Turning to the sexual abuse allegations, Respondent also does not meet her burden. The U.S. Supreme Court has recognized that "[s]exual abuse of a child is one example of an intolerable

27

situation" that would preclude repatriation. *Golan v. Saada*, 596 U.S. 666, 680 (2022). In analyzing claims of sexual abuse, courts have held that merely a "strong suggestion of sexual abuse" is insufficient to satisfy the clear and convincing evidence standard. *Galaviz v. Reyes*, 95 F.4th 246, 261-62 (5th Cir. 2024). The rigor for the clear and convincing evidence standard in the sexual abuse context requires eyewitnesses, contemporaneous testimony, or contemporaneous evidence. *See id*. at 262. Often, whether abuse has occurred will depend on the credibility of the witnesses. *See Nowlan v. Nowlan*, 543 F. Supp. 3d 324, 363 (W.D. Va. 2021). Courts have rejected the application of the grave risk exception where sexual abuse allegations are not sufficiently substantiated. *See, e.g., Nowlan*, 543 F. Supp. 3d at 365; *Galaviz*, 95 F.4th at 261-62; *Charalambous v. Charalambous*, 2:10-cv-375, 2010 WL 4115495, at *10 (D. Me. Oct. 12, 2010); *Kufner v. Kufner*, 480 F. Supp. 2d 491, 509-10 (D.R.I. 2007); *Clarke v. Clarke*, 08-690, 2008 WL 2217608, at *8‑9 (E.D. Pa. May 27, 2008); *Edoho v. Edoho*, H-10-1881, 2010 WL 3257480, at *6 (S.D. Tex. Aug. 17, 2010); *Stirzaker v. Beltran*, CV09-667-N-EJL, 2010 WL 1418388 (D. Idaho Apr. 6, 2010); *Steffen F. v. Severina P*., 966 F. Supp. 922, 926 (D. Ariz. 1997); *Abrego v. Garfias*, 1:24-cv-2272-MLB, 2024 WL 6956468, at *8 (N.D. Ga. Dec. 30, 2024).

Respondent does not present clear and convincing evidence of sexual abuse. Not only did the allegations arise in a suspicious manner, but they are not sufficiently substantiated. The Child first disclosed the alleged sexual abuse some time in August 2025, after she had been in the United States for 8 months. *Id*. at 607:7-11; Ans. ¶ 91. The timing of the sexual abuse allegations is suspicious in and of itself, particularly in light of the Department of State's letter for the voluntary return of the child dated August 6, 2025, addressed to Respondent in New York. *See* Pet'r Ex. 19.

Respondent's mother testified that she observed changed behavior in the Child, such as urinating on herself and sleep issues, and that the Child began exhibiting abnormal behavior while

28

showering.  Tr. at 688:13-21.  Specifically, Respondent's mother stated that although the Child. was already showering in "underwear panty," she began wearing dresses, long-sleeve shirts and shorts to be completed covered.  *Id.* at 689:17-22.  The Court finds this testimony confusing and of diminished probative value given the statement that the Child was wearing clothing while bathing in the first place.  *See id.*  Moreover, the Court finds it troubling that such a change in behavior would be noticed but not expressed, investigated or reported by Respondent's mother, or anyone, contemporaneously.  Furthermore, Respondent's mother's testimony is controverted by the testimony of Petitioner's partner, who indicated that the Child bathed privately and without issue while at Petitioner's home.  *Id.* at 824:3-11.

Respondent relies heavily on the expert opinion of Dr. Favaro in attempting to meet her burden in regard to the sexual abuse allegations.  The Court acknowledges that Dr. Favaro was an expert retained for the purpose of this litigation and has a limited scope of information.  Dr. Favaro only interviewed Respondent, the Child's maternal grandparents, and the Child's American therapist.  *Id.* at 715:22-25.  Notably, Respondent informed Dr. Favaro that Petitioner was sexually abusive toward her, *id.* at 734:10-19, but Respondent did not testify to such allegations at the Hearing nor did she provide any evidence that Petitioner otherwise engaged in sexually deviant behavior.

While Dr. Favaro ultimately concluded that the Child faced a risk of re-traumatization if she returned to Argentina, *id.* at 771:17-19, the Court finds this conclusion speculative and not based on the credible facts and admitted evidence in this action.  Dr. Favaro did not diagnose the Child with post-traumatic stress disorder ("PTSD"), and he further testified that the Child's American therapist had not diagnosed her with PTSD.  *Id.* at 768:10-11.  Moreover, in addition to the information provided by Respondent, Dr. Favaro relied on the Child's behavioral signs of

trauma but did not discuss alternative sources of that trauma.  Tr. at 765:14-766:23.  Courts have found that sexual abuse allegations are insufficient to satisfy the clear and convincing standard when alleged behaviors consistent with sexual abuse can be explained by other events.  *See, e.g.*, *Charalambous*  2010 WL 4115495, at *10 (finding that behaviors consistent with sexual abuse could also be explained by the stress of being brought to the United States and being separated from the child's father); *Kufner*, 480 F. Supp. 2d at 496 (finding symptoms of bed-wetting, nervous eye twitching, sleeplessness and nighttime crying and screaming not attributable to sexual abuse and instead attributable to high-conflict custody dispute); *Galaviz*, 95 F.4th at 258-59 (finding that behavioral regressions could be attributed to the fact that the child was separated from the father rather than sexual abuse); *Stirzaker*, 2010 WL 1418388, at *9 (finding that fear of the petitioner could be based on a long period of no contact).  Particularly relevant on this point is Dr. Favaro's admission that he did not review records related to the Child's psychological treatment in Argentina, nor did he know the Child received psychological treatment in Argentina.  Tr. at 768:19-25.  Given Dr. Favaro's acknowledgment that it is customary to review treatment notes of a subject if they are available, *id.* at 805:8-11, and Voci's confirmation that she took notes during her sessions with the Child, *id.* at 875:3-7, there is a critical gap in Dr. Favaro's assessment of the Child, and the Court declines to adopt his opinion when such credible information was not considered.  Respondent has therefore not proven by clear and convincing evidence that Respondent sexually abused the Child.

Accordingly, Respondent has not proven by clear and convincing evidence that returning the Child to Argentina would put her at a grave risk of harm.

### 2.  Mature Age Defense

Respondent's mature age defense fares no better.  Article 13 of the Hague Convention permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and

has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." This defense must be established by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(2)(B).

"Whether a child is mature enough to have its views considered is a factual finding" that a district court must make in light of the specific circumstances of each case. *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007). As such, there is no "minimum age at which a child is old enough and mature enough to [object and] trigger this provision." *Velozny ex rel. R.V. v. Velozny*, 550 F. Supp. 3d 4, 22 (S.D.N.Y. 2021), *aff'd*, 21-1993-cv, 2021 WL 5567265 (2d Cir. 2021).

Respondent provided no substantive evidence that the 7-year-old Child is sufficiently mature. Instead, Respondent relies on the testimony of Dr. Favaro. From the Child's single evaluation, Dr. Favaro opined that the Child was mature enough to know that she would be frightened if she returned to Argentina. Tr. at 769:14-24. Dr. Favaro did not conduct any additional psychological testing on the Child, nor did he present any testimony regarding the Child's intellect compared to her chronological age. He relied solely on her alleged understanding of the link between her negative emotions and returning to Argentina. *Id.* Moreover, he admitted that he has never found a 7-year-old child to be "mature," *id.* at 796:25-797:1, and Respondent has failed to cite a single case in which—nor is the Court aware of a single case in which—a 7-year-old was found sufficiently mature to have their views considered. Respondent has therefore failed to meet her burden in establishing that the Child is mature enough to have her views considered.

Even if the Court were to find the Child sufficiently mature, the Court would hesitate to give weight to the Child's objection to return. "A child's objection to being returned may be accorded little if any weight if [for example] the court believes that the child's preference is the product of the abductor parent's undue influence over the child." *Laguna*, 2008 WL 1986253, at *9 n.9; Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg.

31

10494 (Mar. 26, 1986). There are a number of factors leading the Court to believe that the Child may be unduly influenced by Respondent. First, the Child has been wrongfully retained from Petitioner for one year. *See* Pet'r Ex. 4; Tr. at 185:16-22. Second, the record has established that Respondent's family has previously restricted Petitioner's access to the Child. Tr. at 163:1-164:14, 166:20-167:7. Finally, and perhaps most importantly, the evidence suggests that Respondent planned to start a life in the United States and retain the Child in the country since at least 2021. *See supra* note 8 (allegations of abuse from 2021 stemming from Respondent's desire to live and the United States and to get the Child a United States visa); Tr. at 862:14-17 (the Child's statements to Voci about moving to the United States and never seeing Petitioner again); Ans. ¶ 86 ("Respondent agreed to a custody arrangement with Petitioner because she believed it was the only way to obtain his consent for the Child to travel and visit her in New York."). Given these circumstances, the Court cannot discount Respondent's motivation to manipulate and influence the Child to express a desire to stay with her in the United States. The Court would decline to credit the Child's objection under such circumstances.

### 3.  Violation of Fundamental Freedoms and Human Rights Defense

Respondent's third affirmative defense similarly fails. Article 20 of the Hague Convention provides that repatriation "may be refused if [it] would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *Souratgar*, 720 F.3d at 108 (quoting Hague Convention art. 20). "The article is to be 'restrictively interpreted and applied'" and "invoked only on 'the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process.'" *Id.* (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10494 (Mar. 26, 1986)). The Court is not aware of a single American case where the Article 20

32

defense has been successfully raised. *See* JAMES D. GARBOLINO, FED. JUD. CTR., THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES 154 n.858 (3d ed. 2023) (noting that as of 2022, the Article 20 defense has never been successfully raised in the United States).

Respondent argues that returning the Child to Argentina while she has a pending asylum application in the United States would violate the obligation of non-refoulment. Resp't Summ. ¶ 54. The Court does not question that the United States is bound by the obligation of non-refoulment, *see* Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267; 8 U.S.C § 1231. However, courts have found that a pending asylum application is not a defense under the Hague Convention and that courts have the authority to order a child's return despite an asylum application. *See Salame v. Tescari*, 29 F.4th 763, 772-73 (6th Cir. 2022); *Jose Junior v. Ferreira de Sousa*, 21-cv-02242, 2023 WL 4228163, at *6-7 (N.D. Ohio June 27, 2023) ("Hague and asylum cases have different evidentiary burdens."); *Sanchez v. R.G.L.*, 761 F.3d 495, 510 (5th Cir. 2014) ("The asylum grant does not supersede enforceability of a district court's order that the children should be returned to [the petitioner] as that order does not affect the responsibilities of either the Attorney General or Secretary of Homeland Security under the INA." (citing *Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 173 (1993))). Accordingly, Respondent has not proven that the Child's return to Argentina would "utterly shock the conscience of the court or offend all notions of due process" such that the Article 20 defense is applicable. *Souratgar*, 720 F.3d at 108.

### D. The Court's Discretion to Order Return

Even assuming that Respondent established any of the foregoing affirmative defenses, the Court retains the discretion to return the Child to Argentina "if return would further the aims of the Convention." *Blondin II,* 189 F.3d at 246 n.4 (2d Cir. 1999) (quoting *Friedrich*, 78 F.3d at 1067).

In light of Petitioner's prima facie case—that Respondent wrongfully retained the Child in the United States, thereby breaching Petitioner's custody rights—even if Respondent were to meet her burden on any of the defenses that she raised, the Court would nonetheless remain inclined to direct return of the Child so as not to incentivize behavior that directly contravenes Hague Convention principles.

## CONCLUSION

For the foregoing reasons, the Court finds that Petitioner has established, by a preponderance of the evidence, a prima facie case of wrongful retention under the Hague Convention and ICARA.  The Court also holds that Respondent has failed to satisfy the burdens of the raised affirmative defenses by either a preponderance of the evidence or clear and convincing evidence, as applicable.  Therefore, the Court grants the petition to return the Child to Argentina. The Child shall be returned to Argentina immediately for an Argentine court to decide issues related to the Child's custody.

The Court orders that by February 20, 2026, at 5:00 p.m., the parties shall file a plan for the safe return of the Child to Argentina, which shall include her travel itinerary and to whom the Clerk of Court shall release her passport.

SO ORDERED.

_/s/_____
ORELIA E. MERCHANT
United States District Judge

February 19, 2026
Brooklyn, New York

34