UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
MARTIN KLADNY,

                    Petitioner,

        -against-

ALEXANDRA JAZMIN RUIZ DEZA,

                    Respondent.

------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
25-CV-5754 (OEM)

ORELIA E. MERCHANT, United States District Judge:

On January 12-14 and 20-23, 2026, the Court held an evidentiary hearing ("Hearing"), on Petitioner Martin Kladny's ("Petitioner") Verified Petition for the return of his child, M.K.R. ("Child"), to Argentina pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 *et seq*. ("ICARA"). *See* Transcript of Civil Cause for Evidentiary Hearing ("Tr."); Verified Petition for Return of the Child, Dkt. 1 ("Petition" or "Pet."). On February 19, 2026, the Court granted the Petition, thereby ordering that "[t]he Child shall be returned to Argentina immediately." *See* Memorandum and Order at 34, dated Feb. 19, 2019, Dkt. 60 ("Order").

The Clerk of Court entered judgment on February 20, 2026. Judgment, Dkt. 62. That same day, Respondent Alexandra Jazmin Ruiz Deza ("Respondent") filed a Notice of Appeal. Notice of Appeal, Dkt. 63. Respondent subsequently filed an emergency motion for a stay in the Second Circuit. *See Kladny v. Deza*, 26-389 (2d Cir. 2026), Dkt. 13. On February 24, 2026, this Court imposed an administrative stay pending the Second Circuit's decision on Respondent's motion to stay. Order, dated Feb. 24, 2026.

On March 20, 2026, Respondent filed in this Court a motion to vacate the judgment pursuant to Federal Rule of Civil Procedure 59(e) ("Rule 59(e)") and/or 60(b) ("Rule 60(b)") on the basis of newly discovered evidence. Motion to Vacate Judgment Pursuant to Rule 59(e) and 60(b) of the Federal Rules of Civil Procedure, Dkt. 71 ("Respondent's Motion" or "Resp't Mot.").

On April 2, 2026, the Second Circuit issued an order holding the pending motion to stay in abeyance until this Court decides Respondent's Motion. Order of the USCA, dated Apr. 2, 2026, Dkt. 80 ("Order of USCA"). This Court subsequently lifted its administrative stay and set a briefing schedule on Respondent's Motion.[1] Order, dated Apr. 2, 2026.

On April 4, 2026, Petitioner filed a motion to enforce the Court's February 19, 2026, Order granting the Petition for the return of the Child. Petitioner's Motion to Enforce Order and Judgment, Dkt. 81 ("Petitioner's Motion" or "Pet'r Mot."). Respondent filed her opposition on April 9, 2026. Respondent's Opposition and Cross-Motion to Petitioner's Motion to Enforce Order and Judgment, Dkt. 85 ("Respondent's Opposition" or "Resp't Opp'n").

For the following reasons, Respondent's Motion is denied and Petitioner's Motion is denied as moot.

## LEGAL STANDARD

Rule 59(e) authorizes motions to alter or amend a judgment. *See* FED. R. CIV. P. 59(e). Such motions "should be granted only when the [movant] identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245,

---

[1] *See* Petitioner's Response in Opposition to Respondent's Motion to Vacate Judgment Pursuant to Rule 59(e) and 60(b) of the Federal Rules of Civil Procedure; Dkt. 84 ("Petitioner's Opposition" or "Pet'r Opp'n"); Respondent's Reply in Further Support of her Motion to Vacate Judgment Pursuant to Rule 59(e) and Rule 60(b) of the Federal Rules of Civil Procedure, Dkt. 87 ("Respondent's Reply" or "Reply").

1255 (2d Cir. 1992)).  "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite of the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).

"Rule 60(b)(2) provides for relief when a movant presents 'newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b).'" *Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*, 609 F.3d 122, 130-31 (2d Cir. 2010) (quoting FED. R. CIV. P. 60(b)(2)).  Relief under 60(b) is properly denied when there is "no indication" that the movant "could not have discovered the evidence earlier" through "reasonable diligence." *Gottlieb v. SEC*, 310 F. App'x 424, 425 (2d Cir. 2009) (first quoting *Schwartz v. Cap. Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993), then quoting FED. R. CIV. P. 60(b)(2)); *see also United States v. International Brotherhood of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001) (noting that relief under Rule 60(b) is "generally not favored and is properly granted only upon a showing of exceptional circumstances").  To prevail on a newly discovered evidence claim, the movant must establish that:

> (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*Teamsters*, 247 F.3d at 392.  "Whether relief is sought under Rule 59(e) or Rule 60(b)(2), courts apply the same strict standard for determining what qualifies as 'newly discovered evidence.'" *Becnel v. Deutsche Bank AG*, 838 F. Supp. 2d 168, 171 (S.D.N.Y. 2011); *see also Teamsters*, 247 F.3d at  391 (noting that "[t]he burden of proof is on the party seeking relief from judgment").

**DISCUSSION**

The Court assumes the parties' familiarity with the record of the prior filings, proceedings, procedural history, and the Court's findings of fact and conclusions of law contained in its February 19, 2026, Order.

### A. Respondent's Motion to Vacate Based on "Newly Discovered Evidence"

Respondent requests that the Court vacate its February 20, 2026, Judgment and deny the Petition for the return of the Child on the basis of newly discovered evidence. Resp't Mot. at 5. Alternatively, Respondent requests that this matter be reopened for a supplemental evidentiary hearing. *Id.* In support of her Motion, Respondent submits Argentine medical records and records related to the Child's March 11, 2026, Post-Traumatic Stress Disorder ("PTSD") and Major Depressive Disorder with Anxious Distress ("Depression") diagnosis from a treating psychiatrist. *See generally* Resp't Mot. The Court addresses each category of evidence in turn.

#### 1. Argentine Medical Records

Respondent submits five Argentine medical records in support of her Motion, arguing that they "establish[] by clear and convincing evidence that the Child faces a grave risk of psychological harm if returned to Argentina." *Id.* at 12. The records pertain to (1) a December 13, 2017, hospital visit by Respondent; (2) an August 18, 2018, hospital visit by Respondent; (3) a September 3, 2018, blood test and ultrasound conducted on Respondent; (4) a September 4, 2018, hospital visit by Respondent; and (5) an October 29, 2018, hospital visit for the Child. *See* Resp't Mot., Exhibit A, Dkt. 71-1 ("Medical Records").[2]

As an initial matter, Petitioner contends that the Medical Records do not qualify as "newly discovered evidence" within the meaning of Rule 59(e) and Rule 60(b). Specifically, Petitioner

---

[2] The pagination of the Medical Records refers to the pagination generated by ECF. Additionally, the Court analyzes the records in chronological order rather than the order in which they are compiled in the ECF document.

asserts that Respondent did not exercise the requisite due diligence in obtaining the records. Pet'r Opp'n at 4-6; *see Teamsters*, 347 F.3d at 392 (requiring that "movant must have been justifiably ignorant of [the evidence] despite due diligence"); *Lashify, Inc. v. Qingdao Network Tech. Co.*, 25-cv-4183 (LJL), 2026 WL 112022, at *7 (S.D.N.Y. Jan. 15, 2026) (noting that "[a] party fails to exercise due diligence in discovering evidence where the party . . . failed to timely begin searching for or requesting relevant records"). In support of this contention, Petitioner argues that Respondent was "notified of this Hague Convention dispute in August 2025," when she was sent a letter from the U.S. Department of State requesting the voluntary return of the Child. Pet'r Opp'n at 5; *see* Pet'r Ex. 19.[3] Further, Petitioner argues that "Respondent raised similar allegations of abuse against Petitioner in her June 2022 asylum application and February 2025 emergency custody proceedings in New York family court, yet she apparently made no effort to obtain the medical records for those proceedings either." Pet'r Opp'n at 5; *see* Pet'r Ex. 95; Pet'r Ex. 17.

Respondent states that because the incidents occurred in Argentina over five years ago, she was advised by the Argentine hospitals that obtaining the archived records would take two to three months. Resp't Mot. at 10. Respondent additionally states that she "attempted to obtain contemporaneous medical documentation from Argentina in December [2025] when the evidentiary hearing in this matter was scheduled." *Id*. Indeed, even before the evidentiary hearing was scheduled, Respondent memorialized her need for time to obtain discovery from Argentina in a pre-motion conference letter sent to the Court on December 15, 2025. *See* Letter from Respondent to the Court (Dec. 15, 2025) at 3, Dkt. 15 ("Additionally, the parties require at least limited discovery, as there are documents located in Argentina to which Respondent does not currently have access, but are believed to be necessary to support her affirmative defenses.").

---

[3] The Court refers to the parties' exhibits admitted into evidence at the Hearing as "Pet'r Ex." and "Resp't Ex.," respectively.

Moreover, counsel for Respondent accepted service of the Petition on behalf of Respondent on December 9, 2025. *See* Order, dated Dec. 10, 2025. Under these circumstances, the Court declines to find that Respondent's alleged failure to pursue the records before that time constitutes a lack of due diligence.

Notwithstanding the dispute as to whether the records qualify as "newly discovered evidence," the Medical Records would not alter the Court's conclusions of law in granting the Petition for the return of the Child. *See Teamsters*, 247 F.3d at 392 (requiring that the "evidence must be admissible and of such importance that it probably would have changed the outcome").

### a. Medical Record regarding Respondent's December 13, 2017 Emergency Room Visit in Argentina

The medical record reflects an emergency room visit by Respondent on December 13, 2017, with a diagnosis of "multiple head injuries," approximately ten months before the Child's birth. *See* Medical Records at 2-3; *see* Pet'r Ex. 3. Respondent has never alleged any abuse by Petitioner connected to this date, makes no mention of an incident connected to that date, and the record itself makes no mention of the cause or manner of injury. *See generally* Resp't Mot.; *see* Medical Records at 2-3. Respondent contends that this visit is consistent with her testimony that she sustained a pattern of abuse by Petitioner. *See* Reply at 3. To the extent Respondent seeks to establish a grave risk of harm to the Child through a sustained pattern of spousal abuse by Petitioner, *see Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014), this record does not alter the the credibility determinations regarding evidence previously presented and conclusions of law in granting the Petion for the return of the Child with respect to the allegations of spousal abuse.

### b. Medical Record regarding Respondent's August 18, 2018 Hospital Visit

Turning to the second medical record, Respondent again fails to demonstrate that the evidence would have changed the outcome. The record shows an August 18, 2018, hospital visit

6

by Respondent, who was pregnant at the time. *See* Medical Records at 8. The record states that the "reason for the consultation" was a "fall and hit." *Id.* The record does not include any other information related to Respondent's injury or the circumstances leading to it, nor does Respondent's motion, and Respondent did not previously allege an incident of abuse taking place on or near the date of this consultation. *See generally id.*; Resp't Mot. Accordingly, Respondent has not established that this record would have changed the Court's outcome regarding the grave risk defense. *See Ermini*, 758 F.3d at 164.

### c. Medical Record of Respondent's September 3, 2018 Diagnostic Tests and Ultrasound

The third medical record shows the results of various diagnostic tests and an ultrasound conducted on Respondent on September 3, 2018, the day before the Child's birth. *See* Medical Records at 21-25. This is the only Argentine medical record that Respondent specifically references in her Motion. *See* Resp't Mot. at 11. One of the reports contained in this record reflects "Multiple Trauma" and "Fast ultrasound." *See* Medical Records at 25. Although this record does not indicate the cause of the trauma, Respondent offers this report as evidence to corroborate her testimony that, on that date, Petitioner pushed her to the ground and kicked her in the stomach twice. Tr. at 514:4-16. However, even with this corroborating evidence, Respondent still has not established that past spousal abuse would expose the Child to a grave risk of harm upon her return to Argentina. *See* Order at 22-24. As for psychological harm, this evidence also does not change the fact that the Child has no memories of domestic violence between Petitioner and Respondent from which she could face re-traumatization. *Id.* at 24-25. Accordingly, the September 3, 2018, record would not have changed the Court's outcome regarding the grave risk defense. *See Ermini*, 758 F.3d at 164.

### d. Medical Record regarding September 4, 2018 Hospital Admission for Child's Birth

The fourth medical record concerns Respondent's September 4, 2018, hospital admission for the birth of the Child.  *See* Medical Records at 11-13.  Respondent fails to demonstrate how this record is material, let alone relevant, to the grave risk defense.  The records shows that Respondent was admitted to the hospital at 3:15 a.m. *See id*.  It merely corroborates the undisputed fact that the Child was born on September 4, 2018.  Accordingly, this evidence would not have changed the Court's outcome.

### e. Medical Record regarding October 29, 2018 Hospital Visit for the Child

The fifth and final medical record concerns an October 29, 2018, hospital visit for the Child.  *See* Medical Records at 16-17.  The reason for the admission was "[h]ead trauma (TBI) without loss of consciousness."  *Id.* at 17.  The record reports the circumstances of the Child's injury as follows:

> The baby, while under the care of her parents, fell from her father's arms. According to the account, the father was holding the baby with his right upper limb, supporting her only on his hand and forearm while attempting to move her from the marital bed to the crib.  The baby fell approximately 50 cm, impacting the occipital region of the skull against the edge of the crib railing, and then the body slid and fell to the base (wooden mattress support) of the box spring bed.

*Id.*  This record generally corroborates Respondent's testimony regarding the incident.  *See* Tr. at 525:5-15 ("When . . . he tried to put her in the crib, her head got hit with the side of the crib.").  As noted by the Court in the Order, Respondent conceded that the "incident was incidental and accidental, not intentional."  Order at 24.  Accordingly, this record would not have changed the Court's outcome.

In summary, the Medical Records, whether considered individually or collectively, would not have changed the outcome.  Thus, Respondent is not entitled to  relief under Rule 59(e) or Rule 60(b)(2) based on the Medical Records

### 2.  Records Related to the Child's PTSD and Depression Diagnosis

Respondent submits documentation regarding the Child's psychiatric PTSD and Depression diagnosis on March 11, 2026, nearly three weeks after the Court issued its Order for the return of the Child.  *See* Resp't Mot., Exhibit B, Dkt. 71-2 ("Diagnosis Letter"); Resp't Mot., Exhibit C, Dkt. 71-3 ("Diagnostic Report").[4]  As an initial matter, like with the Medical Records, Petitioner contends that the Diagnosis Letter and Diagnostic Report are not "newly discovered evidence" within the meaning of Rule 59(e) and Rule 60(b).  Pet'r Opp'n at 10.  Specifically, Petitioner asserts that the PTSD and Depression diagnosis did not exist at the Hearing but could have been discovered earlier.  *See id.*; *Teamsters*, 247 F.3d at 392 (requiring that "the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding"); *Gottleib*, 310 F. App'x at 425 (holding that relief under a newly discovered evidence theory is properly denied when there is "no indication" that the movant "could not have discovered the evidence earlier through reasonable diligence" (internal citation omitted)).

Respondent asserts that the diagnosis was "pending at the time of trial" as the Child "was on a waiting list to be evaluated by a psychiatrist at Hispanic Counseling Center, the therapy clinic where she had been treated by a psychologist since September 2025."  Resp't Mot. at 13.  As further explained by Respondent in her Reply, the diagnosis was rendered following a course of treatment beginning in September 2025, and "Petitioner's suggestion that Respondent should have simply taken the Child to a different doctor to obtain a faster diagnosis ignores both the clinical

---

[4] The pagination of the Diagnostic Report refers to the pagination generated by ECF.

reasoning behind the Child's treatment protocol and the obvious risk of generating an unreliable assessment by circumventing it."  Reply at 4-5.  Under these circumstances, there is indeed "no indication" that the movant could have discovered the evidence earlier, so the PTSD and Depression diagnosis qualifies "as newly discovered evidence."  *See Gottleib*, 310 F. App'x at 425 (quoting *Schwartz*, 984 F.2d at 54).

In addition to his opposition under the "newly discovered evidence" standard, Petitioner contends that the Diagnosis Letter and Diagnostic Report are inadmissible hearsay.  Pet'r Opp'n at 11-15.  Petitioner addresses the Diagnosis Letter and Diagnostic Report as four separate pieces of evidence: (1) the Diagnostic Report itself; (2) the Diagnosis Letter itself; (3) the Child's statements as memorialized in the Diagnostic Report; and (4) Respondent's statements as memorialized in the Diagnostic Report.  *Id.* at 11.

### a.  Diagnostic Report Itself

Respondent argues, without analysis, that the Diagnostic Report "would fall under the [Federal Rule of Evidence] 803(4) hearsay exception or under the residual hearsay exception."  Resp't Mot. at 9-10.  However, the "statement made for medical diagnosis or treatment" hearsay exception under "Rule 803(4) does not open the door to all out-of-court statements made by doctors or medical providers; to the contrary, the rule applies only to statements made by or derived from the individual seeking medical attention."  *Sanderson v. Leg Apparel LLC*, 23-7969, 2025 WL 1873869, at *1 (2d Cir. July 8, 2025).  As Respondent does not explain to what extent the Diagnostic Report is derived from the Child's statements or otherwise conduct any analysis, she has not met her burden in showing that the Rule 803(4) hearsay exception applies.  *See United States v. Kidd*, 23-6400, 2025 WL 3687811, at *1 (2d Cir. Dec. 19, 2025) ("The burden is on the proponent of the evidence to show that an exception to the rule against hearsay applies.").

10

As for the residual exception, the proffered evidence "must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991); *see also* FED. R. EVID. 807(a) (applying the residual exception where "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"). Notwithstanding Respondent's failure to analyze these requirements, the Diagnostic Report is supported by sufficient guarantees of trustworthiness given the totality of the circumstances. The Child's diagnosis is not "the product of a single litigation-driven session with a hired expert," but rather, it was "rendered under the DSM diagnostic framework following months of continuous treatment." Reply at 5. Additionally, the Diagnostic Report, along with the Diagnosis Letter, is the only evidence offered regarding a formal diagnosis of the Child's condition. Accordingly, the Court shall consider the evidence pursuant to the residual exception. However, as discussed more extensively below, the Court does not assign significant weight to the Child's diagnosis as it was rendered more than one year following Respondent's wrongful retention. *See* Order at 19-20; *see generally* Diagnostic Report. Further, only Respondent and the Child were consulted in the creation of the Diagnostic Report, and the conclusions reached in the Diagnostic Report are based solely on the physical and sexual abuse allegations that the Court found lacked credibility. *See* Order at 25-30; *see generally* Diagnostic Report.

**b. Diagnostic Letter Itself**

Turning to the Diagnosis Letter, Respondent does not state the basis for its admission, but the Court assumes that Respondent offers the evidence pursuant to Federal Rule of Evidence

11

803(4) or the residual hearsay exception.  For the same reasons discussed above with respect to the Diagnostic Report, Respondent has failed to establish that the Rule 803(4) hearsay exception applies, but the Court will nonetheless consider the Diagnosis Letter pursuant to the residual hearsay exception.

### c.  Child's Statements Contained in the Diagnostic Report

Regarding the Child's statements contained in the Diagnostic Report, Petitioner contends that such statements constitute double hearsay: an out-of-court statement by the Child, filtered through an out-of-court report prepared by Dr. Idalia Cruz ("Dr. Cruz").  Pet'r Opp'n at 14. Evidence consisting of multiple layers of hearsay is only admissible if there is an exception for each layer.  *See* FED. R. EVID. 805; *United States. v. Cruz*, 894 F.2d 41, 44 (2d Cir. 1990).  While the Child's statements may be considered admissible under Rule 803(4), Respondent has not offered authentication from either the Child or Dr. Cruz.[5]  *See Bentivegna v. People's United Bank*, 14-cv-599 (ADS) (GRB), 2017 WL 3394601, at *8 (E.D.N.Y. Aug. 7, 2017) (holding that a social worker's notes based on statements made to the social worker by the plaintiff were "double hearsay" and had to be authenticated by the plaintiff or the social worker).  Accordingly, Respondent has not established that the Child's statements in the Diagnostic Report are admissible.

### d.  Respondent's Statements in the Diagnostic Report

Finally, with respect to Respondent's statements in the Diagnostic Report, "to the extent a medical record contains third-party statements, such material is hearsay, and an independent basis is required for admitting these statements."  *D.R. ex rel. Rodriguez v. Santos Bakery, Inc.*, 675 F. Supp. 3d 355, 360 (S.D.N.Y. 2023).  "The Court must take steps to determine the reliability and

---

[5] The Court notes that in her Reply, Respondent requests an evidentiary hearing so the records may be authenticated by Dr. Cruz and so the Court may benefit from live testimony in ruling on the admissibility of the Diagnosis Letter and Diagnostic Report generally.  *See* Reply at 5.  As the Court finds that consideration of the evidence would not change its outcome, Respondent's request is denied as moot.

12

veracity of such statements, including by inquiring into the relationship between the declarant and the patient, as well as any *motive of the declarant to lie*." *Id.* (emphasis added); *see also Shea v. Royal Enters.*, 09 Civ. 8709 (THK), 2011 WL 2436709, at *10 (E.D.N.Y. June 16, 2011) ("[I]n cases involving child abuse, a court may reasonably question a parent's motive to tell the truth."). Here, the Court cannot disregard Respondent's motive to obtain post-judgment relief from the Court's Order, and the Court has already expressed concerns regarding her credibility and influence over the Child. *See* Order at 22-25, 31-32; *infra* note 7. Accordingly, Respondent has not established that her statements in the Diagnostic Report are admissible.

Notwithstanding whether the PTSD and Depression diagnosis and related records are "newly discovered evidence" or inadmissible hearsay, the Court's consideration of the records would not change the outcome. The Diagnosis Letter and Diagnostic Report do not cure the defects the Court previously identified in relation to the grave risk defense, nor do they undermine the credibility determinations on which the Order rests.

To begin, the PTSD and Depression diagnosis is predicated on the same physical and sexual abuse allegations that the Court found lacked reliable, contemporaneous substantiation. *See* Diagnostic Report at 12-13; Order at 25-30. The Child's post hoc diagnosis does not fill that evidentiary gap. Further, the timing, context, and content of the evaluation and resulting Diagnostic Report undermines its probative value and reliability. The diagnosis was rendered on March 11, 2026, at which point the Child had been wrongfully retained in the United States for more than a year. *See* Diagnostic Letter; Diagnostic Report at 2. While Respondent argues that "uprooting this fragile seven-year-old[] diagnosed with PTSD . . . would expose her to a grave a risk of psychological harm and put her in an intolerable situation," Resp't Mot. at 14 (quoting *Saada v. Golan*, 712 F. Supp. 3d 361, 378 (E.D.N.Y. 2024)), the Diagnostic Report does not

13

address how Respondent's act of uprooting the Child from Argentina may have contributed to the diagnosis or the Child's fragility.  As recognized by the Court in the Order, there may be alternative sources of the Child's trauma, and "sexual abuse allegations are insufficient to satisfy the clear and convincing standard when alleged behaviors consistent with sexual abuse can be explained by other events."  Order at 30 (collecting cases).  The Diagnostic Report does not address any alternative sources of the Child's trauma that are likely relevant here, such as separation from her family,[6] adaptation to a new country and language, and being caught in the middle of a high-conflict family dispute and legal proceeding.  *See generally* Diagnostic Report.  Moreover, the Diagnostic Report notes that Respondent was present during the evaluation of the Child.  *See id.* at 12.  As discussed in the Order, the Court cannot discount Respondent's influence over the Child given the Child's age, the length of the Child's retention, the volatile family dynamic, and Respondent's long-held plan to live in the United States with the Child.  *See* Order at 30-32; *see also* Diagnostic Report at 13 ("Patient wishes are: never in her life not to go to Argentina, for her maternal grandparents to come to the USA and to stay[] with her mother forever.").

Furthermore, the Court still finds the testimony of the Child's Argentine therapist, Jesica Cecilia Voci ("Voci"), to be the most probative evidence related to the grave risk defense.  As noted by the Court, Voci treated the Child just before the time period in question, "long before this litigation arose."  Order at 27.  She also "had no prior connection to either party," and she "interviewed every relevant family member."  *Id*.  The Diagnostic Report states that the Child

---

[6] As an exhibit attached to her Opposition to Petitioner's Motion, Respondent filed "Patient Discharge Instructions" related to a February 19, 2026, hospitalization of the Child.  *See* Resp't Opp'n, Exhibit B, Dkt. 85-2 ("Patient Discharge Instructions").  The document includes a "Behavioral Health Safety Plan" for the Child.  *See id*.  It states: "The one thing that is most important to me and worth living is: My grandparents Frank and Luz and playing with my dolls."  *Id.*  As illustrated by the Court's findings of fact in the Order, the Child's maternal grandparents have been a constant in her life since birth up until her wrongful retention in the United States.  *See* Order at 4-11.  Given the Child's own statement that her maternal grandparents, who reside in Argentina, are "the one thing most important to [her]" and make life "worth living," *see* Patient Discharge Instructions, the Court cannot discount the destabilizing effect of her separation from them.

"was seen by a psychologist in Argentina during [the] father['s] custody case from May 2024 and August 2024," but there is no indication that Dr. Cruz reviewed Voci's records in reaching her diagnosis. *See* Diagnostic Report at 13.[7] Thus, just as the Court recognized this critical gap in Dr. Peter Favaro's forensic assessment of the Child prior to the Hearing, Order at 30, the same critical gap remains in Dr. Cruz's more recent evaluation of the Child.

Finally, the Diagnostic Report does not establish that the Child's PTSD or Depression symptoms will be exacerbated by returning to Argentina. *See generally* Diagnostic Report. The Diagnostic Report also makes no mention of when the Child's symptoms first arose, and as discussed above, the Diagnostic Report does not account for other likely causes of the Child's symptoms. *See generally id.* As such, Respondent's argument that "uprooting this fragile seven-year-old[] diagnosed with PTSD" would expose the Child to a grave risk of psychological harm is not only speculative, but accepting it runs the risk of rewarding Respondent for the psychological harm created by her uprooting the Child when wrongfully retaining her. *See Souratgar*, 720 F.3d at 104 (upholding the district court's finding that the grave risk exception did not apply as "there is nothing in the record beyond speculation that [the child] would suffer unavoidable psychological harm if returned to Singapore"). Accordingly, the Child's PTSD and Depression diagnosis would not change the outcome.

In summary, the Child's March 11, 2026, PTSD and Depression diagnosis does not entitle Respondent to relief under Rule 59(e) or Rule 60(b)(2). Respondent's Motion is therefore denied.

---

[7] The Diagnostic Report also states that "[o]nce overnight visits were in place[] the counseling stopped." Diagnostic Report at 13. This statement is inconsistent with the evidence adduced at the Hearing. The Court found that the Child began sleeping at Petitioner's home in May 2024 and that the Child was seen by Voci from March 2024 through September 2024. *See* Order at 7-10. The Court also found that the Child's sessions with Voci ended due to Respondent withdrawing her consent. *Id.* at 9. Assuming the statements in the Diagnostic Report regarding the Child's therapy in Argentina came from Respondent, the Court notes this inconsistency and omission as a further reflection of Respondent's lack of credibility.

15

**B. Petitioner's Motion to Enforce**

Petitioner requests that the Court enforce its February 19, 2026, Order for the return of the Child given the restoration of this Court's jurisdiction, the lack of an administrative stay, and the Hague Convention's mandate to resolve cases expeditiously. *See generally* Pet'r Mot. However, as noted by the Second Circuit in its Order on April 2, 2026, Respondent's motion to stay filed in the Second Circuit is merely held "in abeyance until the District Court decides the pending motion to vacate its Judgment, at which point the appeal will once again become effective." Order of the USCA; *see also* FED. R. APP. P. 4(a)(4)(B)(i); *Hodge ex rel. Skiff v. Hodge*, 269 F.3d 155, 157 n.4 (2d Cir. 2001) (explaining that when a timely Federal Rule of Rule of Appellate Procedure 4(a)(4) motion is filed, "the notice of appeal must be held in abeyance by this Court until all such motions are disposed of, at which point the notice of appeal becomes effective"). As the Court denies Respondent's Motion, her appeal is once again effective, and the Second Circuit's jurisdiction is restored. *See* Order of USCA. The Court therefore denies Petitioner's Motion as moot.

**CONCLUSION**

For the foregoing reasons, Respondent's Motion is denied and Petitioner's Motion is denied as moot. As jurisdiction is now vested with the Second Circuit, the Court's Order for the return of the Child is once again administratively stayed pending the Second Circuit's decision on Respondent's motion to stay.

SO ORDERED.

_____/s/_____
ORELIA E. MERCHANT
United States District Judge

April 17, 2026
Brooklyn, New York

16